UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DANIEL PICHÉ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:05-CV-82-MJK |
| | ) | |
| CORLISS NUGENT et al., | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED[1] MEMORANDUM OF DECISION[2] ON PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MOTION TO EXCLUDE EXPERT TESTIMONY**

With the pending motions Daniel Piché seeks to preclude the defendants from using the
"helmet defense" to obtain a comparative negligence instruction or from introducing comparative
negligence expert testimony at trial that seeks to assign causative fault to Piché and his deceased
wife, Lyne Laprise, for not wearing helmets while riding on Piché's motorcycle. It is undisputed
that the accident in question arose solely as a consequence of defendant Corliss Nugent's failure
to remain awake while driving, thereby permitting the vehicle he was operating to collide with
Piché's motorcycle. I conclude that even if the helmet defense is viable as a matter of law in this
circuit, the expert testimony that the defendants would rely on in support of a comparative fault
finding is not suited to reliably assist the jury in any allocation of fault under the facts of this
case without resort to pure speculation and surmise. I therefore grant Piché's motion to strike
experts' testimony (Docket No. 26) and, as a result, grant the plaintiff's motion for summary

---

[1]  This amendment simply clarifies footnote 8 and corrects the spelling of <u>Rodgers</u> at a number of places in the opinion.

[2]  Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

judgment on defendants' comparative negligence affirmative defenses (Docket No. 22). I also grant the plaintiff's motion for summary judgment against the defendants' affirmative defenses of failure to mitigate damages.

### Summary Judgment Facts

The following statement of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this District's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining the "the spirit and purpose" of Local Rule 56). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, all evidentiary disputes appropriately generated by the parties' statements have been resolved, for purposes of summary judgment only, in favor of the non-movant. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

On August 8, 2004, defendant Corliss Nugent was operating a Mazda motor vehicle that he had rented from Enterprise Rent-A-Car Company, Inc. (Pl.'s Statement of Material Facts, (PSMF) ¶¶ 1-2.) While driving the car on U.S. Route 201 in Bingham, Maine, the car collided with a motorcycle being operated by plaintiff Daniel Piché and also being ridden upon by Piché's wife, Lyne Laprise. (Id. ¶¶ 3-4.) It is undisputed that Mr. Nugent fell asleep at the wheel prior to the collision and that, as a result, the motor vehicle he was operating collided with Mr. Piché's motorcycle and the motorcycle trailer being towed behind it. It is also undisputed that neither Mr. Piché nor Ms. Laprise was wearing a helmet at the time. (PSMF ¶ 5; Def.'s Opposing Statement of Material Facts (DSMF) *passim*; Def.'s Statement of Add'l Material Facts ¶¶ 1-2.)

Enterprise asserts that Ms. Laprise's death might have been avoided had she worn a helmet and offers that opinion in "qualification" of Mr. Piché's statement that only Mr. Nugent is

at fault for the collision.  Enterprise has presented no evidence that would tend to call into question the fact that only Mr. Nugent was at fault for the collision itself.  (PSMF ¶¶ 13-16; DSMF ¶¶ 13-16.)  Mr. Nugent has admitted that neither Mr. Piché nor Ms. Laprise were "comparatively or contributorily or otherwise negligent in connection with the Collision." (PSMF ¶ 16; Requests for Admissions ¶¶ 9-10.)

Ms. Laprise sustained significant physical injuries in the collision.  In addition to fracturing her pelvis (a pubic ramus fracture), her head struck the pavement when she was ejected from the motorcycle.  (PSMF ¶ 6; DSMF ¶ 6.)  According to reports prepared by ambulance technicians, Ms. Laprise was unresponsive and then combative at the accident scene, and had a dysconjugate gaze and a left gaze preference.  (DSMF ¶ 8.)  A subsequent CT scan showed no evidence of a skull fracture, but parenchymal hemorrhage, a small subdural hematoma, some subarachnoid blood and early swelling with midline shift.  (DSMF ¶¶ 8, 10.)[3] Following the collision Ms. Laprise was brought by ambulance to Reddington-Fairview General Hospital in Skowhegan, Maine, where she received treatment for her injuries.  (Id. ¶ 8.)  After her treatment at Reddington-Fairview General Hospital, Ms. Laprise was transferred to Eastern Maine Medical Center in Bangor, Maine.  (Id. ¶ 9.)  Ms. Laprise received surgery at Eastern Maine Medical Center, including a craniotomy and a Pentobarbital-induced coma, in order to reduce pressure on her brain.  (Id. ¶¶ 8, 10.)  Despite her treatment, Ms. Laprise died five days after the collision on August 13, 2004, at Eastern Maine Medical Center.  (Id. ¶ 11.)  It is undisputed that Ms. Laprise died as a result of the injuries she sustained in the collision.[4]  (Id. ¶ 12; Jan. 24, 2006, Letter from Seth Kolkin, M.D., to Sidney Thaxter, Esq., Thaxter Aff. Ex. 3.)

---

[3]     Mr. Piché sustained only lacerations to his head and a broken finger.  (PSMF ¶ 7.)  His injuries are not material to the pending motions.

[4]     In its statement of material facts, Enterprise denies the statement that Ms. Laprise died as a consequence of her head injury.  However, it is apparent that Enterprise's medical expert recognizes that Ms. Laprise died as a

## Summary Judgment Discussion

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required." Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

Mr. Piché first argues that he is entitled to summary judgment as a matter of law on each of the following four affirmative defenses asserted by Mr. Nugent:

---

consequence of brain swelling, hemorrhaging and secondary brain infarctions that developed as a consequence of the trauma to her head.  (Jan. 24, 2006, letter from Seth Kolkin, M.D., to Sidney Thaxter, Esq., Thaxter Aff. Ex. 3, Docket No. 32.)  Indeed, Dr. Kolkin flatly states: "She died as a result of her head injury."  (Id. at 2.)  Furthermore, lest there be any doubt on the subject, counsel for Enterprise indicated during oral argument that it was undisputed that Ms. Laprise died as a result of her head injury.

     1.  Plaintiff may be guilty of contributory fault either directly or by imputation, to a sufficient degree as to bar or reduce any recovery;

     2.  All damages of which Plaintiff complains, if any, may have been caused or contributed to by parties other than this Defendant and over which it had no control or responsibility;

     3.  Some or all of Plaintiff's alleged damages may have been caused or contributed (sic) by pre-existing, subsequent, or intervening events, causes, or conditions;

     4.  Plaintiff may have failed to mitigate any damages.

(Mot. Summ. J. at 4.)  Mr. Nugent has failed to respond to the motion for summary judgment. Nevertheless, Mr. Piché is entitled to summary judgment against Mr. Nugent's affirmative defenses only if the undisputed facts call for judgment as a matter of law.  Enterprise has submitted a legal memorandum that contests the motion.  Accordingly, I will address the viability of Mr. Nugent's affirmative defenses in the context of my discussion of Enterprise's affirmative defenses.

     Mr. Piché seeks summary judgment against all eight affirmative defenses asserted by Enterprise.  Enterprise voluntarily withdraws three of these eight defenses and asserts that two others really aren't the proper objects of a summary judgment motion.  (Def.'s Summ. J. Mem. at 3-5.)  In reply, Mr. Piché does not quibble with the latter assertion and presses his motion only with respect to Enterprise's affirmative defenses numbered 4, 5 and 6.  (Pl.'s Reply Mem. at 1.) Those affirmative defenses read as follows:

     4.  The negligence of the plaintiff Daniel Piché was equal to or greater than that of defendant Enterprise, and therefore, Plaintiff's Complaint is barred, or his recovery must be reduced in proportion with his negligence.

     5.  Plaintiff is guilty of fault which is greater than or equal to that of defendant Enterprise and therefore Plaintiff's recovery is either barred or reduced in accordance with 14 M.R.S.A. § 156.

     6.  Plaintiff has failed in his duty to mitigate damages, therefore, plaintiff is barred from recovery against Enterprise.

(Mot. Summ. J. at 5.)

Pursuant to a Maine law, now preempted by a congressional enactment, an owner engaged in the business of renting motor vehicles for use on public ways "is jointly and severally liable with the renter for damage caused by the negligence of the renter in operating the vehicle and for any damages caused by the negligence of a person operating the vehicle by or with the permission of the renter."  29-A M.R.S.A. § 1652; see also Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, 119 Stat. 1144 (amending U.S. Code Title 49, Chapter 301 to preempt state statutes that impose vicarious liability on rental car companies for the negligence of their renters, but not taking effect upon actions commenced prior to the date of enactment).  In a prior ruling, I found that this statute applies to the claims pending against Enterprise.  Thus, Enterprise is jointly and severally liable with Mr. Nugent in this action.  I address each of the material defenses below.

## A.      Comparative Negligence or Fault

Enterprise's fourth affirmative defense asserts that Enterprise cannot be liable or that Mr. Piché's recovery must be reduced on account of Mr. Piché's comparative negligence.  In its opposition memorandum Enterprise describes this fault as Piché's failure to wear a helmet and his decision to convey Ms. Laprise upon the motorcycle knowing she was not wearing a helmet. (Def.'s Summ. J. Mem. at 6.)  Enterprise's fifth affirmative defense asserts that the "Plaintiff" shares fault and therefore is barred from recovering or must have his recovery reduced.  In its memorandum Enterprise describes this fault as belonging to both Mr. Piché and Ms. Laprise. (Id. at 7.)  I have already found that there is no genuine issue of material fact in the record concerning comparative fault for the collision.  However, Maine's comparative negligence is worded to make liability and any damages award turn on the plaintiff's fault for "the damage" or

"the damages," not "the accident" or even "the occurrence of damage."  The statute reads, in

pertinent part, as follows:

> When any person suffers death or damage as a result partly of that person's own fault and partly of the fault of any other person or persons, a claim in respect of that death or damage may not be defeated by reason of the fault of the person suffering the damage, but the damages recoverable in respect thereof must be reduced to such extent as the jury thinks just and equitable having regard to the claimant's <u>share in the responsibility for the damage</u>.
>
> When damages are recoverable by any person by virtue of this section, subject to such reduction as is mentioned, the court shall instruct the jury to find and record the total damages that would have been recoverable if the claimant had not been at fault, and further instruct the jury to reduce the total damages by dollars and cents, and not by percentage, to the extent considered just and equitable, <u>having regard to the claimant's share in the responsibility for the damages</u>, and instruct the jury to return both amounts with the knowledge that the lesser figure is the final verdict in the case.
>
> Fault means negligence, breach of statutory duty or other act or omission that gives rise to a liability in tort or would, apart from this section, give rise to the defense of contributory negligence.
>
> <u>If such claimant is found by the jury to be equally at fault, the claimant may not recover</u>.

* * * *

14 M.R.S.A. § 156 (emphasis added).  Once again, it is undisputed that Mr. Piché and Ms.

Laprise are not at fault for the collision.  Neither defendant has generated a genuine issue of

material fact whether anyone other than Mr. Nugent is at fault for the collision.  The material

questions, then, are whether there is evidence capable of supporting a finding that Mr. Piché

and/or Ms. Laprise were at fault for the damages, as opposed to the collision, and whether the

evidence is capable of enabling a jury to return a comparative negligence special verdict in favor

of the defendants without resorting to speculation.

7

### 1.      *Mr. Nugent's admission*

Mr. Nugent has admitted that neither Mr. Piché nor Ms. Laprise were "comparatively or contributorily or otherwise negligent in connection with the Collision."  (PSMF ¶ 16, citing Nugent's Resp. to Req. for Admis. ¶¶ 9-10.)  Mr. Piché argues that this admission is binding on Enterprise and that it precludes any argument that the jury ought to be charged with assessing comparative fault.  There is some persuasive precedent to the effect that this admission should bind Enterprise under the circumstances of this case, see Graham v. Wilkins, 138 A.2d 705 (Conn. 1958), but I am not persuaded that the admission is worded broadly enough to preclude the comparative negligence defense.  Mr. Nugent admitted that neither Mr. Piché nor Ms. Laprise were negligent "in connection with the collision," but he did not admit that they were not negligent or otherwise at fault in connection with Ms. Laprise's death or damages.  At best, the request for admission was worded ambiguously on this issue and, therefore, should be construed so as not to preclude the comparative negligence defense with regard to the severity of the head injury suffered by Ms. Laprise.  See Talley v. United States, 990 F.2d 695, 699 (1st Cir. 1993) ("To the extent that the request [for admission] is ambiguous, that ambiguity is to be construed against [the party] whose lawyer drafted the request.").  Accordingly, whether or not Enterprise is bound by the admission, the admission does not extend to the question of whether Mr. Piché or Ms. Laprise share fault for the severity of the damages suffered in this case, assuming for the moment that such a defense can otherwise be maintained on the facts of this case.

### 2.      *Enterprise's reference to "the Plaintiff's" fault*

The fifth affirmative defense refers to the comparative fault of "the Plaintiff," whereas the fourth affirmative defense refers to the comparative fault of "the Plaintiff Daniel Piché."  Mr. Piché argues that Enterprise has failed to plead as an affirmative defense that Ms. Laprise was

partially at fault for her death because Ms. Laprise, being deceased, does not technically fit under the category "the Plaintiff." (Mot. Summ. J. at 9.)  With respect to the Estate's claim, Enterprise responds that it has asserted that Mr. Piché (the plaintiff) "was negligent when he allowed his wife, Lyne Laprise, to ride as his passenger on his motorcycle without any protective headgear/motorcycle helmet." (Def.'s Summ. J. Mem. at 6.)  Enterprise also asserts in a footnote that its affirmative defenses encompass Ms. Laprise's comparative fault because Mr. Piché, as representative of his wife's estate, "is responsible for her comparative negligence." (Id. at 6 n.3.) I read Enterprise's fifth affirmative defense (and Mr. Nugent's first affirmative defense) to be worded broadly enough to include an assertion that Ms. Laprise bore some fault for her death because she chose not to wear a helmet.

### 3. Viability of the "helmet defense"

The central issue is whether the undisputed fact that Ms. Laprise chose to ride on a motorcycle without a helmet is a material fact that can compromise the claims for damages that are set forth in this case.  Pursuant to the comparative negligence statute, "fault" means "[1] negligence, [2] breach of statutory duty or [3] other act or omission that gives rise to a liability in tort or [4] would, apart from this section, give rise to the defense of contributory negligence."  14 M.R.S.A. § 156.  Mr. Piché argues that the failure to wear a helmet while riding a motorcycle does not constitute fault under any of the four categories identified in the statute.  (Mot. Summ. J. at 12.)  I agree with Mr. Piché that the failure to wear a helmet does not fit under the first three categories because there existed no legal duty for Mr. Piché or Ms. Laprise to wear a helmet, or for Mr. Piché to require Ms. Laprise to wear a helmet while riding on his motorcycle, see 29-A M.R.S.A. § 2083, and because the failure to wear a helmet could not give rise to liability in tort.  Thus, the only remaining fault category concerns whether or not the decision to ride a

motorcycle without wearing a helmet was an "act or omission that . . . would . . . give rise to the defense of contributory negligence." 14 M.R.S.A. § 156. As Mr. Piché acknowledges, common law contributory negligence did not turn exclusively on the existence of a duty to another, but also on the existence of "a general duty to exercise reasonable care for one's own safety." (Mot. Summ J. at 12, quoting Wing v. Morse, 300 A.2d 491, 499 (Me. 1973)). But, did the common law duty of care for one's own safety extend so far as to require the donning of protective devices in order to guard against all foreseeable negligence of others? Plaintiff's counsel asserted that he could not find any common law case supporting that proposition despite considerable searching. I have also been unable to locate a case addressing such a question. I have looked at some Maine contributory negligence cases for insight into the working of Maine's former contributory fault regime. Although I have found nothing directly on point on the question of fault for damages, as opposed to fault for an injurious occurrence or event, one recent comparative negligence case and a collection of earlier Maine cases involving contributory fault questions appear to support the proposition that, in a contributory negligence context, a plaintiff need not have anticipated the unlawful operation of the defendant so long as the plaintiff was operating in accordance with the rules of the road.

In Davis v. Severance, the Law Court vacated a judgment on a jury verdict that reduced the plaintiff's damages for comparative fault where there was no evidence that the plaintiff pedestrian was crossing the road when she was struck by the defendant's vehicle. 657 A.2d 1153, 1154 (Me. 1995). In effect, a pedestrian walking outside of the roadway does not have any duty to anticipate negligent motorists leaving the roadway. Thus, even under the current comparative negligence regime, one need not constantly be on guard against all foreseeable dangers.

As for contributory negligence cases, in Wells v. Sears, 136 Me. 160, 4 A.2d 680 (1939), the plaintiff fell asleep while riding as a passenger in an automobile.  The defendant operator of the automobile brought an exception to a referee's report in favor of the plaintiff, arguing that it was legal error for the referee not to find that the plaintiff was contributorily negligent for falling asleep because, had he been awake, he could have warned the defendant of the presence of a parked car extending into the roadway.  136 Me. at 161-62, 4 A.2d at 681.  The Law Court agreed that a passenger must use ordinary care to warn of apparent danger, but affirmed the referee's report because there was an absence of evidence that the plaintiff could have done anything to prevent the accident had he been awake.  136 Me. at 164-65, 4 A.2d at 682.  The collection of cases cited by the Court describe contributory fault in terms of fault having a causal connection with the "accident" or the "collision" or "the damage complained of" or "the injury," but not "the damage*s*."  The Wells Court phrased the "crux of the matter" thusly:  "whether the passenger, though alert and watchful, could have prevented the negligent act of the driver in colliding with another vehicle."  136 Me. at 163, 4 A.2d at 681.  In the case cited for fault contributing to the "the damage complained of," Field v. Webber, 132 Me. 236, 169 A. 732 (1933), the plaintiff represented the estate of a motorcyclist who died as a result of a collision. All of the relevant facts concerning the decedent's potential contributory fault concerned his operation of the motorcycle, and whether such operation complied with the traffic statutes, without regard to any inherent danger in riding a motorcycle without a helmet.[5]  132 Me. at 243, 169 A. at 735-36.  The Court sustained the defendant's exception because the facts demonstrated a failure on the decedent's part to sound his horn while passing the defendant's truck, because that was something the applicable traffic laws required him to do.  132 Me. at 245, 169 A. at 737.

---

[5]     Of course, modern safety helmets were not available in the 1930s but are readily available today.

Moore v. Fenton, 289 A.2d 698 (Me. 1972), similarly illustrates the significance that the observation of traffic laws had on negligence cases decided under the contributory negligence regime.  In Moore, the Law Court held that plaintiff motorist had the right to assume that the defendant motorist who was approaching the same intersection at a right angle would observe a stop sign and yield the right of way to the plaintiff, there being no stop sign facing the direction from which the plaintiff motorist was traveling.  289 A.2d 698, 700-701 (Me. 1972).  The case was tried according to the law of contributory negligence, id. at 703 n.5, and the Court addressed itself to the question of how or whether a plaintiff was to prove the absence of contributory negligence on his part when he had the right by law to operate "his motor vehicle without being continuingly on guard to anticipate that other drivers will violate the law, or otherwise operate negligently, in relation to the legal right of way."  Id. at 707.  Thus,

> the plaintiff having the legal right of way, -- as a generalized principle . . . -- may drive with a degree of faith.  He may exercise his legal right of way in fact on the *affirmative assumption and reliance* that there will be an *absence* of any violation of law or negligent conduct by other persons in contravention of the legal right of way.  This remains his right until circumstances develop which show the assumption to be unwarranted.

Id.  In effect, where liability was concerned a plaintiff had the right to go before the jury under circumstances that justified his faith in the observation of due care by other motorists with respect to the legal rules of the road, without having to prove the absence of facts that might tend to show his or her own contributory fault.  Although the plaintiff was still left to the potential of an unfavorable jury verdict, it is important that the Law Court placed a legal standard on overcoming the assumption that others will observe the applicable traffic laws.  Thus, a jury instructed on this matter should have been told that, "the right *affirmatively to assume* the *absence* of conduct by other persons in violation of law and derogation of plaintiff's right of way persists and continues until there [is] a showing, affirmatively, that circumstances had arisen

which would make an ordinarily prudent person in the position of plaintiff *aware* of the probability" that the defendant would violate the rules of the road and that such knowledge would have been achieved "in *sufficient time* for reasonable action to be taken to avoid the collision." Id. at 708 (emphasis in original). This language tends to suggest that, on a summary judgment motion of the sort presented here, a defendant could be expected to present evidence capable of generating a genuine issue of material fact that the plaintiff had cause to assume that the defendant would probably not observe the rules of the road.[6] Here, because the defendants have not generated as a genuine issue of material fact the existence of any special circumstances from which Mr. Nugent's negligence could have been anticipated as a probability by Mr. Piché or Ms. Laprise, summary judgment might be called for as a matter of law. Modern summary judgment practice, although not observed when the doctrine of contributory negligence was the law in Maine, calls for the presentation of genuine issues of material fact in advance of trial. It is undisputed that Mr. Nugent fell asleep at the wheel while operating his vehicle and that his negligence is the sole cause of the collision that brought about Ms. Laprise's death. Mr. Nugent violated a fundamental rule of the road that Mr. Piché and Ms. Laprise had every right, according to Moore v. Fenton, to assume he would observe. One might well foresee the possibility of an accident. But motor vehicles accidents are not yet so commonplace that travelers must anticipate

---

[6]     If this were a case in state court it would be an open question of law for the court to decide whether to impose on motorcycle passengers, absent special circumstances not present here, a common law duty to anticipate the negligent operation of another and to don a helmet in response—or other protective gear such as heavy boots or a heavy leather jacket—in order to mitigate in advance any foreseeable injury. With respect to legal policy, the slippery slope that is so apparent here invites contemplation of numerous hypothetical means of self protection and whether courts really ought to instruct juries on comparative negligence in all such cases having competent evidence of a causal connection between the failure to take precautions and the damages that resulted. For instance, plaintiff's counsel contemplates a duty for motorcyclists to wear body armor. Even with automobiles there is room for problematic scenarios. It is generally well-known that SUVs are prone to rolling over in accidents. Would that fact justify a comparative negligence instruction when a plaintiff's most severe injury is attributable to a roll over that would not otherwise have occurred? If the jury could return verdicts for the defendant in all such cases, even in the absence of any fault on the plaintiff's part for the accident itself, one wonders whether we have really moved beyond the much-maligned contributory negligence bar that comparative negligence statutes were designed to relieve us of. On the other hand, the fact that it is difficult to determine where to draw the line as a matter of law and policy may be the best reason to permit a jury of reasonable people to determine such matters against a reasonable care standard.

them as the probable outcomes of any excursion.  If they were, ordinary care might call for us to abandon the roads altogether.  In my view, in the absence of any positive duty to wear a helmet while riding a motorcycle and in the absence of any circumstances tending to demonstrate that Mr. Piché or Ms. Laprise should have regarded the collision at issue in this case as a probable conclusion to their motorcycle trip, their failure to wear helmets may well not have been treated as contributory negligence under the Maine common law in existence prior to the enactment of the comparative negligence statute.[7]

Whatever accuracy this assessment of earlier Maine common law has, if any, the Court of Appeals for the First Circuit has already given the nod to the helmet defense in the context of Maine's comparative negligence statute.   In <u>Rodgers v. Am. Honda Motor Co.</u>, 46 F.3d 1 (1st Cir. 1995), the Court affirmed a decision by Judge Hornby to permit the jury to return a verdict on comparative negligence where uncontroverted evidence existed that the plaintiff's permanent brain injury would not have occurred but for his decision not to wear a helmet.  Focusing entirely on the way in which the language of the Maine comparative negligence statute makes the availability of a recovery turn entirely on the question of whether the plaintiff is equally or more

---

[7]      Circa 1991, it appears that most judges who addressed the helmet defense, including Justice Clifford of the Law Court, had actually ruled against it as a matter of law, though the opposing viewpoint was well represented and apparently growing at the time.  <u>See</u> <u>Meyer v. Des Moines</u>, 475 N.W.2d 181, 187, 191 & nn. 1, 2 (Iowa 1991) (collecting cases and declining to hold that a common law duty exists to wear a helmet); <u>Partridge v. Walker</u>, CIV-81-387, 1985 Me. Super. LEXIS 67 (Me. Super. Ct., And. Cty., Mar. 18, 1985).  Of course, each comparative negligence statute is different, which is precisely why the viability of the helmet defense in Maine must be judged in terms of its ability to fall under the category of an "act or omission that . . . would . . . give rise to the defense of contributory negligence."  14 M.R.S.A. § 156.  When one looks to the state of the common law at the time contributory negligence was an operative doctrine in Maine, without regard to any of the other provision of Maine's comparative negligence statute, it appears to have been well engrained in the common law that one need not anticipate the negligence of others, however much that proposition may have been called into question since the wide-scale adoption of comparative negligence statutes.

Mr. Piché argues that any available helmet defense ought to be treated consistently with any available seat belt defense, pointing out that recognition of the helmet defense in the absence of any statutory duty to wear a helmet is "incongruous" with 29-A M.R.S.A. § 2081, which mandates seatbelt usage but also provides that nonuse of a seatbelt "is not admissible in evidence . . . except in a trial for violation of this section."  <u>Id.</u> § 2081(5).  (Pl.'s Mot. Summ. J. at 13.)  It is apparent that the Legislature crafted a compromise provision in regard to seatbelt usage.  That compromise has not been repeated in the statute that pertains to helmet usage.  Any incongruity, therefore, is directly attributable to the Legislature, not this Court.

at fault for "the damages," as opposed to the accident, the Court concluded that "helmet evidence was admissible on liability."  Id. at 3.  Mr. Piché argues that I can simply distinguish Rodgers on the ground that it involved a situation in which the operator of an ATV himself caused the ATV to flip over under circumstances where he knew it was malfunctioning, having just attempted a repair.  These facts could well have generated a question whether the operator was aware of a probability of the malfunction that caused the ATV to flip, and therefore should reasonably have donned a helmet, but the opinion does not actually inform the reader of the facts in enough detail to make such a determination and, perhaps making matters more difficult, the Court nowhere indicated that its opinion rested on the existence of such factors.  In fact, there is no indication in the Rodgers opinion that the Court of Appeals considered whether the helmet defense fits within the particular category of something that "would, apart from this section, give rise to the defense of contributory negligence."   14 M.R.S.A. § 156.  Mr. Piché has contested whether the failure to wear a helmet can fairly be pigeon-holed into that category. [8]  Because that question was never addressed in the Rodgers opinion it might well afford the best basis on which to distinguish Rodgers.  Such a distinction might even be consistent with Rodgers based on the fact that Rodgers appeared to involve contributory fault arising from the plaintiff's decision to operate the ATV having an awareness of the probability of a malfunction (i.e., special circumstances that

---

[8]    The Rodgers opinion found on the LexisNexis database contains two sentences that do not appear in the West reporter or in the Westlaw online database.  LexisNexis reports the following two sentences were appended to the first paragraph of the opinion: "Singularly, however, no one here concerned has ever quoted [the comparative negligence statute's] language, or made more than general reference to its terms.  We feel somewhat in the position of a reviewer of a performance of Hamlet where the Prince remained in the wings."  Rodgers, 1995 U.S. App. LEXIS 1836, *2.  This language would tend to reinforce the appearance that the Court of Appeals was not considering whether the helmet defense was a defense that would have given rise to the defense of contributory negligence in Maine prior to, and apart from, the enactment of Maine's comparative negligence statute.  The Court of Appeals's website reflects that it issued a March 10, 1995, errata sheet that struck the last three sentences of the first paragraph eliminating that language from the opinion.  Discovering the omitted language on the LexisNexis database was simply a piece of serendipity.

bear directly on liability and not just damages), whereas the instant case does not present awareness of Mr. Nugent's negligence.

In any event, despite the foregoing consideration of how a Maine court would have treated the helmet defense in the context of a contributory negligence scheme, I am not entirely persuaded that summary judgment should enter on the basis of a legal conclusion that the failure to wear a helmet in the modern day does not amount to a lack of ordinary care for one's own safety.  In certain cases of clear contributory fault, First Circuit precedent as set forth in <u>Rodgers v. Am. Honda</u> could well result in the denial of a similar motion for partial summary judgment. I am, however, persuaded that the expert testimony that Enterprise would present on the issue of comparative fault in this case cannot reliably assist the jury in its task of assessing comparative fault under the Maine statute and is, therefore, inadmissible as a matter of law pursuant to Federal Rule of Evidence 702 and <u>Daubert v. Merrill Dow Pharmaceuticals</u>, 509 U.S. 579 (1993).  I address that issue below, after considering the defendants' failure to mitigate defenses.

**B.    Failure to Mitigate**

Mr. Piché's summary judgment motion also targets the defendants' "failure to mitigate" affirmative defenses.  (Mot. Summ. J. at 9-10.)  According to Enterprise, the failure to mitigate concept fits with this case because Ms. Laprise "could have avoided and/or reduced the severity of her injuries by wearing a motorcycle helmet."  (Def.'s Summ. J. Mem. at 8.)  I agree with Mr. Piché that current precedent calls for the legal conclusion that this defense does not apply to the facts of this case.  "A plaintiff's duty to mitigate damages arises after he or she has suffered an injury or loss, and focuses on whether the plaintiff took reasonable steps to avoid or reduce damages that were proximately caused by the negligence of the defendant."  <u>Searles</u>, 2005 ME 94, ¶ 38, 878 A.2d at 521.  In light of this temporal limitation on the duty to mitigate, <u>see also</u>

16

Walter v. Wal-Mart Stores, Inc., 2000 ME 63, ¶ 24, 748 A.2d 961, 969 ("Traditionally, one of the distinctions between contributory negligence and the doctrine of mitigation of damages, or avoidable consequences, has been a temporal one."), Ms. Laprise's failure to wear a helmet does not properly support Enterprise's failure to mitigate defense.  The record is devoid of evidence suggesting that Mr. Piché or Ms. Laprise could have done anything subsequent to the collision to lessen the damage caused or to prevent Ms. Laprise's death.

**Motion to Strike Expert Testimony**

Subsequent to filing his motion for summary judgment Mr. Piché filed a motion to strike certain testimony of Seth Kolkin, M.D., Enterprise's medical expert, and Bruce McNally, its accident reconstruction expert.  Piché contends that their testimony in support of Enterprise's helmet defense should be excluded at trial because it is entirely speculative as to the question of whether a helmet would have saved Ms. Laprise's life.  I agree.

In Wing v. Morse, the Law Court described the "so-called" comparative negligence statute as more in the nature of a "Damage Apportionment Act," noting that it "mandates an apportionment of damage between two persons, both of whom acted unreasonably and thus brought about the damage." Wing, 200 A.2d at 499.  In addition, the Law Court observed that "fault not contributing to the damage cannot be taken into account. The only fault that can be considered is fault apart from which the damage would not have occurred." Id. at 500.  Of course, the term "fault" is itself a potentially uncertain term.  We are told that fault is not merely a question of the relative degree to which each party's conduct works to bring about the damage, but also the relative degree of blameworthiness that attaches to each party's conduct. Id. at 500-501.  Thus, "[t]he factfinder must be told [to] give consideration to the relative blameworthiness of the causative fault of the claimant and of the defendant." Id. at 500.  Here, Ms. Laprise

17

elected not to wear a helmet, whereas Mr. Nugent fell asleep behind the wheel of a vehicle traveling in excess of 50 mph on a public way.  His negligence was the but for cause of the accident.  Was the alleged fault of Ms. Laprise and Mr. Piché a legal cause of Ms. Laprise's death?

According to Bruce McNally of McNally & Associates Accident Reconstruction Services, LLC, had Ms. Laprise been wearing a helmet during the collision "the forces acting on her head would have been significantly reduced."  This opinion is based on "statistical information from published studies" that motorcycle helmets are 65 percent effective in preventing brain injuries, without differentiating among the type of motorcycle accidents at issue, and additional studies that suggest an even greater effectiveness when the accident involves head impact with the pavement and no other serious injuries.  (Def.'s Expert Designations, Accident Reconstruction Report at 8, Docket No. 26, Ex. 2, citing Nat'l Highway Safety Traffic Admin. Jan. 1998 Research Note, Further Analysis of Motorcycle Helmet Effectiveness Using CODES Linked Data at 2, Docket No. 22, Ex. 4;  see also McNally Aff. ¶¶ 21, 35-49.)

Mr. McNally characterizes Ms. Laprise's injury as "an inertial brain injury that was unaccompanied by a skull fracture."  (McNally Aff. ¶ 34.)  As Mr. McNally explains, in a blunt force trauma situation, helmets "increase the amount of ride-down distance of the head upon impact with the ground [because] the foam interior of the helmet is designed to compress and deform, thus absorbing energy, while at the same time providing an additional distance to decelerate from one speed to another," thereby decreasing the g-forces or change in velocity experienced by the brain.  (Id.)  One study he relies upon describes the process in the following manner:

> [B]ecause the qualified motorcycle helmet attenuates the impact and reduces the
> acceleration of the head within the helmet, the probability of contrecoup
> contusion and intracerebral hemorrhage/hematoma is reduced, and when the
> acceleration is reduced below tolerance levels, those injuries are then prevented.
> . . . .
> [H]elmet function attenuates impact to reduce head acceleration so the probability
> of these inertial injuries is reduced, and helmets will prevent these injuries when
> the accelerations are within tolerance.

(McNally Aff. ¶ 42, Docket No. 35, Elec. Attach. 2, quoting Hurt, Jr. Hugh H., Thom. David R.,

Motorcycle Head Injury Mechanisms—With and Without Helmets, Association for the

Advancement of Automotive Medicine, October 1992, Docket No. 35, Ex. E.)  According to Mr.

McNally, in pavement-only head contacts, a helmet will "nearly assure" that no serious brain

injury occurs so long as the rider only falls off the motorcycle and strikes his or her head on the

pavement, without striking the head against any other object.  (Id. ¶ 45, quoting Ouellet, James

V., Appropriate and Inappropriate Strategies for Injury Reduction in Motorcycle Accidents, at

48, Society of Automotive Engineers, 900747, March 1990, Docket No. 35, Ex. D.)  This is so,

he attests, because the significant change in velocity measure is the change in velocity the head

experiences after accelerating toward the ground due to gravity and then suddenly stopping

(along the vertical axis) upon contact with the ground, which causes the brain to be displaced in

the direction of the skull on the side of impact.[9]  In comparison, when a rider thereafter slides

along the ground horizontally, he or she gradually decelerates without subjecting the brain to

severe changes in velocity (assuming the head does not collide with another object).  (Id. ¶ 43.)

---

[9]      One report cited by McNally describes inertial injuries in the following fashion:

> The "inertial" injuries . . . are the results of the head being accelerated (usually by impact) then all
> the distributed and concentrated masses within the skull developing forces resisting this
> acceleration. . . . [T]he components of the brain are deformed and displaced relative to each other
> when the head is accelerated."

Hurt, Motorcyclist Head Injury Mechanisms—With and Without Helmets, supra, at 246.  With respect to inertial
injuries of the kind Ms. Laprise died from, Hurt and his co-author conclude: "Helmeted motorcyclists receive a very
high level of protection from contact injuries [for example, the serious scalp laceration suffered by Ms. Laprise], but
inertial injuries are the inevitable result of severe head impact, and can not be excluded by any helmet."  Id. at 249.

Thus, according to McNally, head injuries in cases of falls from motorcycles traveling at high-speeds are often consistent with injuries in falls from motorcycles traveling at reduced speeds, so long as approved helmets are worn and the head only strikes against the pavement.  (Id. ¶ 45; see also Ouellet, supra, at 47-48.)  Because of the ameliorative effect of helmets in cases of pavement-only impact, which he considers this to be, Mr. McNally opines that, had Ms. Laprise worn an approved helmet, "the likelihood of her sustaining a severe brain injury would have been significantly reduced" because her head was within six feet of the ground when she fell, which is within the energy-absorbing range of an approved motorcycle helmet.  (Id. at 9; McNally Aff. ¶¶ 36, 53.)  This six-foot criteria is significant because it is the standard against which motorcycle helmets are measured and corresponds with the velocity at which a person's head would be traveling due to gravitational acceleration in a drop from six feet.  (McNally Aff. ¶ 55.)  None of the studies cited by Mr. McNally appear to statistically account for motorcycle passengers versus motorcycle drivers.

Mr. McNally's accident reconstruction is designed to place Ms. Laprise's head velocity within the "six-foot drop" and "pavement only impact" parameters.  Mr. McNally describes the accident sequence in his report as follows:

**Mazda versus the Honda**

. . . .

The impact to the rear of the Honda [presumably the motorcycle trailer] resulted in the destabilization of the motorcycle, resulting in the rear of the motorcycle spinning leftward from its initial point.  However, the rear-end impact was insufficient to result in the occupants of the motorcycle being ejected.  Both the rider and the passenger stayed with the motorcycle when it fell onto its right side on the pavement and began to slide.

As the motorcycle slid across the pavement, it began to slow, while at the same time the Mazda continued to close toward it.  There was a secondary contact between the right front of the Mazda and the rear of the motorcycle, which

20

resulted in a redirection of the motorcycle.  The redirection of the motorcycle was accompanied by the motorcycle flipping from its right side to its left side.  Both the motorcycle rider and passenger were ejected at this point and both reportedly came to final rest along a path consistent with the final path of the motorcycle.

. . . .

### Motorcycle Passenger Kinematics

By comparing the motorcycle's path of travel to that experienced by the occupants of the motorcycle, we conclude that the motorcycle rider and passenger stayed with the motorcycle until the secondary impact occurred.  This secondary impact, while in and of itself not a severe event, resulted in the motorcycle rotating and then flipping onto its left side from an initial position with its right side toward the pavement.  This motion resulted in both the rider and the passenger separating from the motorcycle.  Both the rider and the passenger struck their heads on the pavement in this incident, with both sustaining lacerations.

However, the passenger of the motorcycle struck her head much harder than did the rider.  From the medical report, we can conclude that the impact to the right rear of Ms. Laprise's head resulted in both coup and contra coup injuries, which resulted in brain swelling and her eventual death.  . . . .

(Accident Reconstruction Report at 7-8.)  The report indicates that Mr. McNally believes the Mazda automobile Mr. Nugent was driving was traveling at a speed of 49 to 55 miles per hour roughly 100 feet *after* it collided with a trailer attached to Mr. Piché's motorcycle and that the motorcycle was traveling at a speed of 40 to 45 miles per hour when first struck and 31 to 32 miles per hour after the secondary collision[10] with the Mazda.  Mr. McNally opines that Ms. Laprise struck her head on the pavement and was ejected during this secondary collision, although he does not explain why.  In Mr. McNally's further estimation, Ms. Laprise continued to travel more than 50 feet after being ejected from the motorcycle.  (McNally Report at 7-8.) He does not opine that she slid along the pavement, simply that she was "ejected" and "traveled."

---

[10]     There is a first hand observation in the record that supports the occurrence of the secondary impact. According to the police report prepared by Somerset County Sheriff's Deputy Michael Knight, which relies on a report given by an occupant of a vehicle positioned behind the collision, the Mazda struck the motorcycle trailer, causing the trailer to separate from the motorcycle, and the motorcycle to tip over and bounce off the passenger side door of the Mazda.

(Id.)  Mr. McNally makes no attempt to estimate the change in velocity or g-force at work on Ms. Laprise's brain when this purported secondary collision with the Mazda occurred, essentially conceding that these critical aspects of Ms. Laprise's passenger kinematics are unknowable.[11] Nor does Mr. McNally address the likely rotational or angular velocity measure that would come into play as a result of the purported flipping of the motorcycle.  Additionally, although Mr. McNally acknowledges the existence of the motorcycle trailer, he does not account for how the force of the Mazda colliding with the trailer may have been translated into rotational or angular velocity by virtue of any twisting or pulling motion exerted by the trailer on the rear of the motorcycle or how such forces in combination with the flipping forces arising moments later from the secondary impact would have impacted any passenger kinematics assumptions.  Nor does he account for the fact that Ms. Laprise was a passenger rather than an operator or how that fact fits in with the studies he cites.  These multiple imponderables, combined with the other concerns addressed below, generate more than a mere matter of weight and undermine the reliability of the proffered expert testimony.

The question is whether this evidence is sufficient to permit a reasonable juror to conclude that Ms. Laprise's failure to wear a helmet was a factor that substantially contributed to her damages, a so-called "legal cause" of her injuries.  Mr. Piché argues that Mr. McNally's opinion is speculative because, whatever he may be able to determine about the velocity and trajectories of the motor vehicles involved in this accident, he has no way of determining the actual velocity at which Ms. Laprise's head impacted the roadway or the change in velocity to which the tissues inside her head were subjected during that impact.  (Mot. to Strike at 2.)  In Mr. Piché's words: "Without knowing those facts (and the amount of force a human brain can

---

[11]      The author of the Ouellet study that Mr. McNally relies on asserts that "[b]ecause the rider is so loosely coupled to the motorcycle during a collision, the acceleration-time histories of the machine and rider are very likely to correlate poorly."  Ouellet, supra, at 48.

withstand) it is not possible to render an informed opinion about whether a helmet would have mattered to *this* victim in *this* case." (Id.)  Mr. Piché makes a similar challenge to Dr. Kolkin's testimony, also observing that Dr. Kolkin did not rely on Mr. McNally's work to form his opinion about the efficacy of a helmet. (Id.)

In its response, Enterprise makes no effort to describe any methodology utilized by Dr. Kolkin to form his helmet opinion.  It does, however, explain that Mr. McNally's helmet opinion is based on published studies addressing, and expertise concerning, the efficacy of helmets in motorcycle accidents.  It also explains how Mr. McNally's accident reconstruction, particularly his unchallenged opinion that Ms. Laprise's head struck the pavement, relates to that body of knowledge, which teaches that pavement-only impacts are unlikely to be fatal or to involve serious brain injury when modern, approved helmets are worn.  (Def.'s Mem. in Opp'n to Mot. to Strike at 9-13, Docket No. 35.)

> Pursuant to Rule 702 of the Federal Rules of Evidence:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579 (1993), the Supreme Court discussed the gate-keeping role federal judges play under Rule 702 in screening from introduction in evidence expert testimony that, although relevant, is nevertheless based on unreliable scientific methodologies.  Id. at 597.  That role is "to ensure that an expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand.'"  United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002).  In General Elec. Co. v. Joiner, 522 U.S. 136 (1997), the Supreme Court

explained that a judge exercising this duty must evaluate whether the challenged expert testimony is based on reliable scientific principles and methodologies in order to ensure that expert opinions are not "connected to existing data only by the ipse dixit of the expert." Id. at 146.  To aid in this task, the Court assigned the following non-exclusive, four-factor standard:

> (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline.

Mooney, 315 F.3d at 62 (citing Daubert, 509 U.S. at 593-94).  In addition to these factors, the trial court may consider other factors that are probative of reliability in light of the particular facts and circumstances of the case at hand.  Id.  Ultimately, the proponent of the expert testimony must establish that it is reliable and relevant to a factual dispute.  The proponent is not required to prove that the expert's opinion is correct.  Id. at 63.  "Once a trial judge determines the reliability of the expert's methodology and the validity of his reasoning, the expert should be permitted to testify as to inferences and conclusions he draws from it and any flaws in his opinion may be exposed through cross-examination or competing expert testimony."  Brown v. Wal-Mart Stores, Inc., 402 F. Supp. 2d 303, 308 (D. Me. 2005).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.

To begin, I do not find that the unknowable character of the exact change in velocity that a motorcyclist's brain experienced in an accident would necessarily preclude an expert from opining on the question of whether a helmet would have prevented a fatal brain injury in a particular case.  With sufficient facts an accident reconstruction expert could perform calculations to fairly approximate the change in velocity that contributed to an inertial brain

injury.  The problem in this case is that, even if it is undisputed that Ms. Laprise's head impacted only against pavement, there is *no* explanation (reliable or not) as to how forceful that impact was or even why it follows that the force must have been less than or equal to the amount of force that would have been in effect if she had simply fallen from a height of six feet.  Indeed, contrary to Enterprise's characterization of the accident as "relatively straightforward" (Def.'s Mem. in Opp'n to Mot. to Strike at 9), Mr. McNally posits that Ms. Laprise struck her head on account of the motorcycle "flipping" without explaining how the rotational velocity of the flipping motorcycle would relate to "passenger kinematics" or why the forces generated by this motion would necessarily be within the studies' critical parameter of acceleration equivalent to a fall from a six-foot height.  In effect, Mr. McNally does not really provide a passenger kinematics opinion because he says nothing probative of Ms. Laprise's motion in space during that critical interval of time when the motorcycle flipped over.  He makes only the rather unremarkable observations that she was ejected and continued to travel.  Furthermore, Ms. Laprise fractured her pelvis at some point following the initial collision.  That fact takes her case out of the lowest-energy category and further dilutes any predictive value that exists in the studies cited by Mr. McNally.

In the end, although the studies cited by Mr. McNally describe a "trend" in motorcycle accident data indicating that motorcycle helmets reduce the gross number and severity of internal and external head injuries (Def.'s Mem. in Opp'n to Mot. to Strike at 10), particularly in low-energy collisions in which the rider's head strikes only the pavement, I fail to see how one could reliably conclude from these studies and from Mr. McNally's accident reconstruction that a helmet more likely than not would have prevented Ms. Laprise from dying or from suffering a serious brain injury.  Stated otherwise, they are not a reliable foundation from which to predict

through the benefit of hindsight that a helmet would more likely than not have prevented Ms. Laprise from experiencing an inertial brain injury capable of causing her death or a debilitating brain injury that, from a legal damages perspective, may have been just as bad.  As a consequence, Mr. McNally's helmet opinion is not adequate to assist the jury to determine the only question to which it could possibly be addressed: how to calculate a fair and equitable reduction in any damages award on account of the alleged fault of either Ms. Laprise or Mr. Piché for Ms. Laprise's failure to wear a helmet.  For that reason, I grant the motion to exclude Mr. McNally's expert opinion that, had Ms. Laprise been wearing a helmet "the forces acting on her head would have been significantly reduced and the likelihood of Ms. Laprise sustaining a severe head injury would have been significantly reduced."  (McNally Aff. ¶ 36; see also id. ¶ 53.)[12]  I also grant the motion to exclude Dr. Kolkin's opinion regarding the effect a helmet would have had, expressed in somewhat different terms,[13] because Enterprise fails to make any showing whatsoever in support of it.  Finally, because this is the only evidence on which the defendants can rely to raise a genuine issue of fact in support of their comparative negligence defenses, I grant Mr. Piché's motion for summary judgment.  The mere fact that Ms. Laprise did not wear a helmet, standing alone without the aid of reliable expert testimony, does not generate a comparative negligence defense.

## Conclusion

---

[12]     It bears noting that the wording of Mr. McNally's opinion is problematic from a legal perspective.  The chance for a fatal or disabling inertial brain injury could have remained higher than 50%, even if "significantly reduced," because it is a certainty that Ms. Laprise died as a consequence of her head injury.  Thus, even if the jury accepted this opinion, it would not establish that, more likely than not, Ms. Laprise would not have suffered death or a serious brain injury.  In this one major aspect, the expert opinion in this case differs significantly from the uncontroverted expert opinion set forth in Rodgers v. Am. Honda Motor Co., 46 F.3d 1 (1st Cir. 1995).

[13]     Dr. Kolkin opines that, had Ms. Laprise worn a helmet, "the forces to her head would have been lessened and therefore her brain injury would probably have been less severe."  (Def.'s Expert Designations, Jan. 24, 2006, Letter from Seth Kolkin, M.D., to Sidney Thaxter, Esq., at 2, Docket No. 26, Ex. 2.)  "Less severe" would still not rule out a disabling brain injury.

For the reasons set forth above, I now **GRANT** the plaintiff's motion to strike expert testimony in support of the "helmet defense."  (Docket No. 26).  I further **GRANT** Mr. Piché's motion for partial summary judgment against the comparative negligence defenses and the failure to mitigate defenses raised in the defendants' answers for failure to generate a genuine issue of material fact in support thereof.  (Docket No. 22.)

***So Ordered***

July 5, 2006                                          /s/ Margaret J. Kravchuk
                                                            U.S. Magistrate Judge